**CARRIERS INSURANCE EXCHANGE and O'Boyle Tank Lines, Incorporated, Appellees and Cross-Appellants,**

v.

**TRUCK INSURANCE EXCHANGE and Maybelle Transport Company, Appellants and Cross-Appellees.**

**No. 8669.**

United States Court of Appeals Fourth Circuit.

Argued Oct. 4, 1962.

Decided Nov. 5, 1962.

654

Frank O. Meade and Edwin B. Meade, Danville, Va. (Meade, Tate & Meade, Danville, Va., on brief), for appellees and cross-appellants.

R. Paul Sanford and J. William Clement, Danville, Va. (Sanford & Clement, Danville, Va., on brief), for appellants and cross-appellees.

Before SOPER, HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

SOPER, Circuit Judge.

This suit for declaratory judgment was brought by O'Boyle Tank Lines, Incorporated, a Virginia corporation, and by Carriers Insurance Exchange, O'Boyle's insurance carrier, against Maybelle Transport Company, a North Carolina corporation, and Truck Insurance Exchange, Maybelle's insurance carrier, to obtain a determination as to the rights and liabilities of the parties with respect to the damages caused by a gasoline explosion which destroyed certain property in Virginia. We are not called upon to interpret the policies since it is agreed that the liability of the insurance companies depends upon the liability of their respective insured. The instant suit was brought after the owner of property destroyed by the explosion instituted an action against both Maybelle and O'Boyle. The District Judge held that both of them were liable to third parties for injuries caused by the explosion and neither had a right of recovery against the other.

The explosion occurred on July 10, 1961 in the course of the delivery of gasoline to a service station at Bassett Forks, Va., by a truck owned by Maybelle and driven by John W. Pearman, its employee. Delivery was made with the use of an electrically operated portable pump, but unfortunately gasoline was accidentally spilled on the ground during the temporary absence of the driver, and was ignited by a spark when he returned and attempted to disconnect the pump. It is conceded that the explosion was caused by the driver's negligence and the purpose of the present suit is to determine whether O'Boyle or Maybelle or both are liable for the ensuing property damages in view of the arrangement between them for the delivery of the gasoline now to be described.

Maybelle has its principal office at Lexington, N. C., and is engaged in the interstate transportation of freight by motor vehicle under a certificate of the Interstate Commerce Commission, but its certificate does not permit it to transport petroleum products in interstate commerce. O'Boyle has its principal office in Arlington, Va., and a terminal at Greensboro, N. C., and is engaged in the interstate transportation of freight by motor vehicle under a certificate of the Interstate Commerce Commission which permits it to transport petroleum products in interstate commerce. Maybelle de-

sired to transport such products from North Carolina to a customer in Virginia and, accordingly, entered into an arrangement with O'Boyle to operate under its certificate. This was accomplished prior to January 30, 1961 by an oral agreement between the two companies under which for each trip Maybelle leased its truck in charge of its driver in North Carolina to O'Boyle for delivery by O'Boyle to the destination in Virginia, the revenue from each trip to be divided 90% to Maybelle and 10% to O'Boyle. There was no agreement as to which company was to carry insurance for public liability or property damage incurred during the trip but each company was aware that the other was obliged to carry such insurance under its Interstate Commerce Commission certificate.

Shortly after January 1, 1961 the two companies were notified by Interstate Commerce Commission officials that this oral arrangement would no longer be permitted. Accordingly, on January 30, 1961 the parties entered into a written lease covering a specified tractor-trailer for one trip on January 31, 1961 from Friendship, N. C., to Martinsville, Va., to expire upon the delivery of the cargo. The lease provided that Maybelle, the lessor, would be liable for property damage and public liability and would provide insurance therefor. The lease also provided for the division of the revenue on the basis of 90% to Maybelle and 10% to O'Boyle as in the earlier oral lease. The transportation of the cargo in this instance was carried out.

In order to continue the transportation of petroleum products from North Carolina to Virginia, Maybelle caused to be printed a large number of blank forms of lease using a printed form which had formerly been used by Maybelle and another party in other transactions. This form of lease, unlike the first lease of January 30, 1961, imposed liability for damages and the duty to provide insurance covering such liability upon O'Boyle, the lessee, and it was subsequently used by the parties on approximately 20 occasions after January 31, 1961, including the final trip on which the explosion occurred. The evidence is clear that neither party to this succession of leases paid more than a casual attention to the contents of the documents and neither party was aware that liability for accidents was imposed by the written lease upon O'Boyle.

In the District Court each party sought a determination that the other was primarily liable for the damages caused by the explosion. O'Boyle, relying upon the decision of this court, in War Emergency Co-op. Ass'n. v. Widenhouse, 169 F.2d 403, contended that it was not bound by the provisions of the lease of July 10, 1961, which provided that the motor vehicle equipment should be solely and exclusively under the direction of the lessee (O'Boyle) and imposed liability upon it for damages resulting from operation of the equipment. This argument was based upon the assertion, sustained by the finding of the District Judge, that the parties did not read the lease and did not intend to impose this liability upon O'Boyle but used the lease merely to satisfy the requirements of the Interstate Commerce Commission, intending to impose upon Maybelle the liability for damages as provided in the first lease of January 31, 1961. Hence, it was said that the lease of July 10, 1961 should be corrected to conform with the parties intent. Disregarding the terms of the lease of July 10, 1961, O'Boyle contended that Maybelle was liable as independent contractor because the driver of the vehicle was Maybelle's employee, and actually subject only to its control. O'Boyle conceded that both parties to the lease were liable for any injury to third parties, Maybelle because the damages were caused by its employee and O'Boyle because it permitted Maybelle to operate under its nondelegable franchise; but O'Boyle nevertheless contended that as between the parties to the lease Maybelle was primarily liable as the actual wrongdoer and, therefore, was obliged to indemnify O'Boyle for any loss it might sustain from the manner in which the operation was carried on.

Maybelle on the other hand contended that the parties did not even read the lease of January 30, 1961 and did not have its contents in mind when they signed it but executed it merely to conform to the regulations of the Interstate Commerce Commission; that this lease in fact did not comply with the regulations since it placed the liability for damages on the lessor, Maybelle, but that the lease of July 10, 1961 covering the transaction now in suit did comply with the regulations in this respect; and since the parties thereto were acquainted with the rules and regulations of the I.C.C. and were aware that they required that the lessee assume liability for damages and provide insurance, the parties to the lease of July 10, 1961 were bound by its provisions even if they did not read them. Maybelle, therefore, argued that there was no ground for setting the lease aside or correcting it on account of mistake.

Maybelle further contended that Pearman became the employee of O'Boyle for the delivery of the cargo since O'Boyle-lessee was the carrier holding the I.C.C. certificate under which the operation was conducted and because the I.C.C. regulations require that the full direction and control of the vehicle be lodged in the holder of the certificate. Under these circumstances, it was said that Maybelle could not be considered an independent contractor in charge of the transportation of the goods and that O'Boyle-lessee must accordingly be held liable for the damages caused by the accident.

■ The District Judge rejected both contentions and held that O'Boyle and Maybelle were equally liable since they used the written form of lease merely to give a semblance of compliance with requirements of the Interstate Commerce Commission while they actually ignored the regulations and engaged in a joint venture in which one party furnished the physical equipment and the other party furnished the license. We are in accord with the conclusion that both parties are liable for the injuries caused by the explosion.

The finding that they used the written lease to give the appearance of compliance with the law while actually ignoring it, is supported by abundant evidence. The statute, 49 U.S.C. § 304(e), authorizes the Interstate Commerce Commission to prescribe regulations for the use by motor carriers of motor vehicles not owned by them under leases or other contractual arrangements, and it is provided that the regulations must require, amongst other things, that the lease be in writing and signed by the parties, that a copy be carried in the vehicle; and that while the vehicle is in use the motor carrier (lessee) shall have full direction and control of the vehicle and be fully responsible for its operation in accordance with the law and regulations. Such regulations were actually passed and are embodied in I.C.C. Regulation Ex Parte No. MC-43, § 207.4. They include a requirement that the authorized carrier, before taking possession of the equipment, shall inspect it in order to insure that the equipment complies with motor carrier safety regulations and, if explosives are to be carried, to inspect the vehicles to insure that they comply with the safety regulations respecting the transportation of explosives. The person making the inspection is required to certify the results on a prescribed form which the carrier must retain, and also to certify that the driver has a physical examination certificate in file with the carrier. The carrier must certify on the inspection report that the person who made the inspection is competent and has been authorized to make the inspection. The inspection form lists 18 items for inspection, including brakes, engine, fuel system and other parts of the vehicle, and the inspector is required to indicate the result of the inspection of each item listed.

The regulations also provide that the carrier must make certain that the driver of the vehicle is familiar with the regulations and must require the driver to furnish a certificate or photostatic copy of physical examination which is required to be retained in the carrier's file.

The carrier is further required to keep certain information covering each trip for which the equipment is used and the carrier must keep manifests of the shipments which indicate that the transportation is carried on by authorized carriers.

The evidence demonstrates beyond question that there was only a token observance of these regulations on the trip in question, as is shown by the following recital of the procedure which was followed by the parties on the 20 trips undertaken by them, including the last.

On July 10, 1961, the driver of Maybelle's truck, Pearman, received orders from Maybelle at Friendship, North Carolina, to deliver gasoline to Bassett Forks, Virginia. Pearman drove his truck from the Maybelle terminal at Friendship to the O'Boyle terminal just a short distance down the highway. There he delivered to O'Boyle's dispatcher two copies of the written lease, already signed by Maybelle, which purported to lease the described equipment to O'Boyle for one trip to Martinsville, Virginia, expiring when the cargo was delivered according to shipping instructions and the vehicle was returned to its origin. The driver also delivered to the dispatcher two copies of the required inspection sheet. O'Boyle's dispatcher signed the lease without reading it, filled out the inspection sheet, and prepared a bill of lading for the shipment. The bill of lading was prepared from oral instructions given the dispatcher by Pearman who left the written order in his truck. Pearman placed on the doors the truck placards, that he received from Maybelle, showing that the unit was under lease to O'Boyle. Afterwards Pearman drove to a gasoline terminal where he loaded his truck; thereafter, he picked up a portable pump for the purpose of pumping the gasoline into the tanks at Bassett Forks. Then Pearman drove the vehicle to Martinsville—and thence to Bassett Forks, where the customer was located and there the accident occurred.

There was, however, no inspection by O'Boyle worthy of the name. O'Boyle's dispatcher testified that such inspection, as took place during the course of the shipments under the several written leases, was customarily made by O'Boyle's shop boy. There was no evidence that any inspection actually took place on the last occasion. Moreover, the undisputed evidence shows that the stop at the terminal took only five minutes, a period long enough for the signing of the papers but entirely inadequate for the inspection of the vehicle. It is beyond question that there was no inspection of the portable pump which Maybelle's driver picked up after he left the O'Boyle terminal and the evidence clearly shows that it was because of the defective operation of the pump that the gasoline overflowed at the point of delivery and exploded when the driver attempted to disconnect the pump.

As to the physical examination of the driver required by the I.C.C. regulations, the dispatcher testified that he did not know whether the driver had been examined by a physician at the request of O'Boyle and that at one time O'Boyle may have had a certificate of physical examination for driver Pearman though it was not necessary for O'Boyle to keep one in its files (notwithstanding the provisions of the regulations to the contrary). The testimony as a whole as to compliance with the regulations on the trip shows beyond any reasonable doubt that the leases, inspection records and physical examination certificates were merely paper transactions without any substantial effort on the part of either party to comply with the relevant regulations. In short, the parties deliberately entered into a transaction in violation of the law and of the regulations which had been promulgated to insure the safe transportation of a dangerous substance for the protection of the general public.

The question of law which arises under these circumstances is whether there may be contribution among joint tort feasors who deliberately ignore statutory provisions enacted for the safety of the public and engage in an enterprise in the course of which injuries are inflicted on third parties by the negligence of one of the participants. In our opin-

ion neither wrongdoer is entitled to recover from the other in this situation.

It is true that the board rule laid down long ago in Merryweather v. Nixan, 8 T.R. 186, K.B. (1799), that no contribution may be allowed to joint wrongdoers in pari dilecto, has been relaxed both by statute and by judicial decision; but the current of authority still supports the rule that a person may be denied contribution from a fellow tort feasor if the parties have been engaged in the commission of a crime or other wrongful conduct in connection with the transaction on which the claim to contribution is based. See Restatement of Restitution, § 86, Introductory Note, § 140. It is generally held that a person who has violated the law should not be permitted to invoke it to obtain restitution in reference to the same transaction, especially when the law in question has been set up for the protection of the public and the denial of restitution will tend to prevent further misconduct. On the other hand contribution is generally allowed when the claimant's conduct amounted to mere negligence or mistake without intentional violation of the law. See Restatement on Restitution, § 88, 101; Prosser on Torts, pages 247 to 249. As to these cases the ancient rule has been relaxed but as to intentional wrongdoing no tendency to relax the old rule is noticeable. See Turner v. Kirkwood, 10 Cir., 49 F.2d 590; Union Stockyards Co. v. Chicago, B. & Q. Railroad, 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453; Hobbs v. Hurley, 117 Me. 449; 104 A. 815; White v. Shawnee Milling Co., 94 Okl. 260, 221 P. 1029; Fidelity & Casualty Co. v. Christenson, 183 Minn. 182, 236 N.W 618. Obviously, the instant case is not within this category.

It may be said that it is not clearly shown in the instant case that the explosion was caused by a defect in the portable pump which might have been disclosed by prior inspection. The evidence is that after the driver left the pump to seek refreshment in a nearby restaurant, the pump ceased to operate effectively so that the gasoline was spilled upon the ground. It may well be that a defect in the equipment was the cause of the failure, and neither party to the illegal transaction has made any attempt to show that the accident was not caused directly by a defect in the pump. But in our view it is immaterial whether the explosion was due to the use of a defective apparatus or to the negligence of the driver of the truck in the course of the operation. We are not concerned merely with the strict application of the rule of proximate cause in determining the liabilities which flow from the accident. A question of public policy is involved. Undoubtedly, the parties deliberately engaged in a dangerous enterprise in violation of the statute and the safety regulations promulgated thereunder, and, consequently, neither one should be entitled to demand contribution from the other if it is called upon to pay damages suffered by third parties in the course of the transaction, and neither one should be relieved of complete liability for the results of an enterprise when the closeness of the wrongful conduct to the final unfortunate result is as manifest as it is in this case. The public policy inherent in the protection of the public is predominant.

The accident occurred in Virginia, and we have not overlooked the provisions of § 8–627 of the Code of Virginia, which provides that contributions among wrongdoers may be enforced when the wrong is a mere act of negligence and involves no moral turpitude. The decisions under this statute, in which contribution has been allowed, were made in cases in which acts of mere negligence were involved.[1] There has been no interpretation of the phrase "moral turpi-

---

[1] Norfolk, etc., R. R. Co. v. Parker, 152 Va. 484, 147 S.E. 461; McLaughlin v. Siegel, 166 Va. 374, 185 S.E. 873; American Employers' Ins. Co. v. Maryland Cas. Co., 4 Cir., 218 F.2d 335; McKay v. Citizens Rapid Transit Co., 190 Va. 851, 59 S.E.2d 121, 20 A.L.R.2d 918; Richmond Coca-Cola Bottling Works v. Andrews, 173 Va. 240, 3 S.E.2d 419; Nationwide Mut. Ins. Co. v. Jewel Tea Co., 202 Va. 527, 118 S.E.2d 646.

tude"; but the affirmative provision of the statute permitting contribution is limited to cases in which the wrong is a mere act of negligence, and the added phrase excluding acts of moral turpitude plainly shows that the legislature did not intend to extend the privilege to participants in intentional illegal acts. In our opinion the statute does not justify contribution or indemnity in the instant case.

It may be added that the two insurance companies have already made equal contributions to the damages and the result of this decision is to leave them in that position. This is an equitable result of the application of the rule against contribution between co-defendants who have intentionally violated the law since the two parties appear equally culpable in the misuse of O'Boyle's operating authority and in the violations of the law and the regulations of the Interstate Commerce Commission.

Affirmed.