# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 29, 2020

Lyle W. Cayce
Clerk

No. 18-20827

STATOIL USA E&P, INCORPORATED,

Plaintiff - Appellant

v.

UNITED STATES DEPARTMENT OF INTERIOR; DAVID BERNHARDT,
SECRETARY, U.S. DEPARTMENT OF THE INTERIOR; OFFICE OF
NATURAL RESOURCES REVENUE; GREGORY GOULD, in his official
capacity as Director of the Office of Natural Resources Revenue,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC 4:17-CV-3664

Before KING, JONES, and DENNIS, Circuit Judges.

PER CURIAM:*

Statoil, an oil and gas company, pays the federal government royalties in order to develop oil and gas reserves on federal land. These royalties are based on the sales that Statoil reports. After multiple warnings, the Department of the Interior assessed a civil penalty against Statoil under 30

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-20827

U.S.C. § 1719(d) for the knowing or willful maintenance of false information related to reported gas sales. Statoil contends that this penalty is invalid because, as a matter of law, Statoil cannot "maintain" false information if the reports are physically stored on a government server. The district court disagreed, finding that the plain meaning of "maintains" includes keeping information in a state of validity. For the following reasons, we AFFIRM.

## I.

## A.

The federal government offers leases to private corporations that develop national oil and gas reserves on both federal land and the Outer Continental Shelf. 30 U.S.C. § 226; 43 U.S.C. § 1337. In return, these corporations pay the government royalties based on the value of the oil or gas extracted. 30 U.S.C. § 226(b)(1); 43 U.S.C. § 1337(a)(1).

Congress enacted the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA), Pub. L. No. 97-451, 96 Stat. 2448 (codified as amended at 30 U.S.C. §§ 1701-1757), "to require the development of enforcement practices that ensure the prompt and proper collection and disbursement of oil and gas revenues owed to the United States." 30 U.S.C. § 1701(b)(3). Consequently, FOGRMA established an "accounting and auditing system" with the "capability to accurately determine oil and gas royalties . . . and to collect and account for such amounts in a timely manner." 30 U.S.C. § 1711(a).[1] The statute requires lessees to "establish and maintain any records, make any reports, and provide any information" that the Department of Interior (DOI) "may, by rule, reasonably require." 30 U.S.C. § 1713. FOGRMA authorizes DOI

---

[1] Before FOGRMA, the "system of accounting" for royalties was "archaic and inadequate," 30 U.S.C. § 1701(a)(2), and the Department of the Interior could not verify lessees' production and sales data because "lease account records [were] so unreliable," S. Rep. No. 97-512, at 9 (1982) ("Senate Report"). The industry was "essentially on an honor system." *Id.*; *accord* H.R. Rep. No. 97-859, at 15 (1982).

No. 18-20827

to request information reasonably required to determine compliance. *See, e.g.*, 30 U.S.C. § 1711(c)(1) (authorizing audits and reconciliations regarding the lessee's "business practices and recordkeeping systems").

Within DOI, the Office of Natural Resources Revenue (ONRR) operates the online database that tracks oil and gas production and royalty information, *see* 30 C.F.R. §§ 1210.54, 1210.104, and implements FOGRMA's enforcement scheme. § 1201.100. On a monthly basis, lessees must submit the volume of oil and gas produced, their sales, and the royalties remitted. 30 C.F.R. §§ 1210.52-.61, 1210.101-.106. In most cases, this information must be submitted online using designated forms, § 1210.54; § 1210.102, and reporters that discover errors must "file an accurate and complete amended report within 30 days," which can also be completed online.[2] 30 C.F.R. § 1210.30.

FOGRMA contains a tiered penalty scheme for violations. 30 U.S.C. § 1719(a)-(d). Section 1719(a) is the lowest tier and penalizes general violations such as "fail[ing] or refus[ing] to comply with any requirements of this chapter or any mineral leasing law, any rule or regulation thereunder, or the terms of any lease or permit issued thereunder." § 1719(a)(1). Lessees are given 20 days to cure § 1719(a) violations, but if they do not, they are subject to a "penalty of up to $500 per day for each day such violation continues." § 1719(a)(2). Relatedly, § 1719(b) permits penalties of up to $5000 per day if a § 1719(a) violation continues for 40 days without correction. Neither § 1719(a) nor § 1719(b) contains a mens rea standard.[3]

By contrast, § 1719(c) and § 1719(d) penalize conduct that is committed "knowingly or willfully." Section 1719(c) permits penalties of up to $10,000 per

---

[2] Reporting instructions may be accessed in the ONRR handbook. Office of Nat. Res. Revenue, *Minerals Revenue Reporter Handbook* (release 3.0, 2015), https://www.onrr.gov /reportpay/handbooks/; *see also* § 1210.56(a).

[3] The Senate Report specifies that these subsections were meant to penalize "inadvertent" violations. S. Rep. No. 97-512, at 17.

day for knowing or willful failures to make a royalty payment; to permit entry, inspection, or audit; or to notify DOI regarding the start of production. Section 1719(d)(1), the provision relevant to this appeal, permits penalties of up to $25,000 per day for "[a]ny person who . . . knowingly or willfully prepares, maintains, or submits false, inaccurate, or misleading reports, notices, affidavits, records, data, or other written information." § 1719(d)(1). Unlike § 1719(a) and § 1719(b), § 1719(c) and § 1719(d) do not contain a period to cure violations, and violations under § 1719(d) can result in criminal liability. 30 U.S.C. § 1720.[4]

## B.

Statoil holds a federal offshore gas lease.[5] In August 2010, ONRR found "significant volume variances" when comparing Statoil's reported volumes with information provided by the gas-plant operators. Consequently, ONRR sent Statoil an order to correct its reported monthly gas production volumes from April 2006 to December 2007. This order instructed Statoil to fix its reports within 30 days and noted that failure to comply could result in penalties.

ONRR contacted Statoil again in January 2011, and yet again in May 2011. Statoil acknowledged that its reports were inaccurate but did not correct them. In August 2011, ONRR informed Statoil that penalties would accrue,

---

[4] The Senate Report indicates that the statute was intended to "distinguish between those violations which ought to lead to a very large civil penalty and those for which liability should be reduced. . . . The Committee attempted to achieve this balance by providing a requirement of notice of violation and a lower civil penalty limit for certain violations of the Act and a steeply rising civil penalty liability for serious violations knowingly or willfully committed." S. Rep. No. 97-512, at 17.

[5] In the interest of avoiding confusion, this opinion refers to the parties by their current designations. Statoil's predecessor-in-interest was Hydro Gulf of Mexico, LLC. ONRR's predecessor was the Bureau of Ocean Energy Management, Regulation, and Enforcement. 75 Fed. Reg. 61,051, 61,052 (Oct. 4, 2010).

No. 18-20827

and that Statoil would be subject to penalties for a "knowing or willful failure to maintain accurate information." Statoil still did not correct its reports.

In February 2012, approximately 18 months after the first notice, ONRR sent a notice of civil penalty to Statoil. It noted that Statoil failed to correct reporting inaccuracies and that, every time it was contacted, Statoil failed either to comply or to respond. Pursuant to 30 U.S.C. § 1719(d), ONRR stated that it was assessing a civil penalty for a "knowing or willful maintenance of incorrect information on gas sales volumes reported." ONRR assessed a penalty of $50 per day, per violation, dating back to January 2011, when Statoil first acknowledged that its reports were inaccurate, for a total of $406,350.

As relevant to this appeal, Statoil moved for summary judgment before an administrative law judge. Statoil argued that, as a matter of law, it could not knowingly or willfully "maintain[]" inaccurate information under § 1719(d) because Statoil does not "maintain" reports in ONRR's electronic database. The ALJ ruled against Statoil, and the Interior Board of Land Appeals affirmed. On appeal, the district court also ruled against Statoil, concluding that that the plain meaning of "maintains" in § 1719(d) includes knowingly or willfully keeping false information in ONRR's online database. This appeal followed.

## II.

A decision granting summary judgment is reviewed de novo. *Century Sur. Co. v. Seidel*, 893 F.3d 328, 332 (5th Cir. 2018). Questions of statutory interpretation are also reviewed de novo. *United States v. Lauderdale County*, 914 F.3d 960, 964 (5th Cir. 2019).

"[S]tatutory interpretation begins and, if possible, ends with the language of the statute. When the language is plain, [the court] must enforce the statute's plain meaning, unless absurd." *Id.* (internal quotation marks and citations omitted). "Dictionaries are a principal source for ascertaining the ordinary meaning of statutory language." *Thompson v. Goetzmann*, 337 F.3d

No. 18-20827

489, 497 n.20 (5th Cir. 2003). Nonetheless, the court may also "rely on the conventional standards of statutory interpretation—*i.e.*, text, structure, and the overall statutory scheme" to "interpret[] the statute as a symmetrical and coherent regulatory scheme." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1023 (5th Cir. 2019) (internal quotation marks and citations omitted). Because the plain meaning of "maintains" includes keeping reports in a state of validity, we conclude that § 1719(d)(1) requires lessees to correct reports they know are false, inaccurate, or misleading, even when the government electronically stores them.

### A.

We first begin with the statute's plain meaning. As noted, § 1719(d)(1) authorizes penalties if "[a]ny person . . . knowingly or willfully prepares, maintains, or submits false, inaccurate, or misleading reports, notices, affidavits, records, data, or other written information." § 1719(d)(1). Dictionaries define the word "maintain" as both to keep physical possession, *see, e.g.*, *Maintain*, *Black's Law Dictionary* (10th ed. 2014), and "to keep in a state of repair, efficiency, or validity," *Webster's Third New International Dictionary* 1362 (1976); *see also id.* ("to affirm in or as if in argument").

The parties dispute whether the plain meaning of "maintains" in § 1719(d) includes reports that are updated online by lessees, such as Statoil, but are physically stored on government servers. Statoil argues that physical possession is necessary because no ordinary person would think that reports are "maintained by the lessee" once submitted to the government. The government asserts that the plain meaning of "maintains" includes keeping reports in a state of validity, especially because the statute was enacted to ensure that royalties are accurately collected.

In other statutory contexts, this court has recognized that "maintaining" an oil record book encompasses "ensur[ing] that [the] oil record book is

6

accurate." *United States v. Jho*, 534 F.3d 398, 403 (5th Cir. 2008). Moreover, the Second Circuit similarly concluded that "[i]n the context of a regulation imposing record-keeping requirements, the duty to 'maintain' plainly means a duty to maintain a reasonably *complete* and *accurate* record." *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 309 (2d Cir. 2009) (emphasis in original).

*Jho* is particularly illuminating. In *Jho*, the defendants argued that they did not violate their duty—under regulations applicable to foreign-flagged vessels only while in U.S. waters—to "maintain" an oil record book, because they made inaccurate entries only while in international waters. 534 F.3d at 403. The Fifth Circuit rejected that argument, reasoning that the defendants' duty to maintain the book while in U.S. waters "impos[ed] a duty . . . to ensure that [the] oil record book is accurate (or at least not knowingly inaccurate)." *Id.*

Statoil attempts to distinguish *Jho* by stating that it "only concerned *where* the obligation to 'maintain' the oil record book applied," as opposed to which entity had "physical possession" of the book. But in *Jho*, there was no question that the defendants' duty applied only in U.S. waters. The operative issue was the extent of the obligations encompassed by the word "maintain."

In the context of a statute that "impos[es] record-keeping requirements," the meaning of "maintain" applies more plainly to ensuring that reports are "reasonably *complete* and *accurate*" than to assigning responsibilities based on which entity physically possesses the record. *See Ionia*, 555 F.3d at 309. In the context of an *online* record-keeping system, a distinction based on physical possession makes even less sense—online information is usually created and updated by entities that do not physically possess the electronic data.[6]

---

[6] The American Petroleum Institute's amicus brief notes that the original meaning of "maintain" cannot include electronic storage because, at the time of the statute's passage, lessees submitted monthly paper reports. Nonetheless, Congress contemplated (and

No. 18-20827

As the district court astutely observed, the plain meaning of "maintain" may refer to upkeep even if another entity physically possesses the object. "[T]wo entities can 'maintain' the same database in different respects. . . . A student 'maintains' stellar grades, even though it is her school that stores the physical or electronic records of her grades. A teenager might 'maintain' his car, even though his parents maintain the garage where it is parked." *Statoil USA E&P Inc. v. U.S. Dep't of the Interior*, 352 F. Supp. 3d 748, 759 (S.D. Tex. 2018). Accordingly, the plain meaning of "maintains" as applied to § 1719(d)(1) requires lessees to correct reports that they know are false, inaccurate, or misleading.[7]

## B.

Because § 1719(d)(1)'s "language is plain, we must enforce the statute's plain meaning, unless absurd." *Lauderdale*, 914 F.3d at 964 (internal quotation marks and citation omitted). Nonetheless, in the interest of being thorough, we evaluate Statoil's claim that the government's reading of § 1719(d)(1) is inconsistent with the statute's overall structure and regulatory scheme. None of these arguments compel us to depart from the statute's plain meaning.

Statoil argues that the government's reading of "maintains" in § 1719(d) is inconsistent with the use of the word "maintain" in § 1712 and § 1713, which refers to documents that the lessee stores internally. Section 1719(d) also refers to both "reports" and "affidavits," however, which are documents that would usually not be stored internally by the lessee. Other sections of the

---

preferred) an electronic system at the time of enactment. H.R. Rep. No. 97-859, at 28 ("The Committee expects the Secretary to complete the development of a computerized fiscal and production accounting system . . . .").

[7] Even if § 1719(d)(1) was ambiguous, the agency's interpretation is reasonable and would therefore warrant *Chevron* deference. *Cf. Clean Water Action v. EPA*, 936 F.3d 308, 316 n.14 (5th Cir. 2019).

statute refer to both "reports" and "affidavits" as documents that are provided to the government. *See, e.g.*, § 1702(17) (mentioning "previously filed report[s]"); § 1712(a) (describing who may "submit reports"); § 1717(a)(1) (referring to the submission of "affidavits"). Moreover, other sections of the statute use "maintain" in a manner that suggests validity rather than mere physical possession. *See, e.g.*, § 1701(b)(2) (stating Congress's intent to "implement and maintain a royalty management system for oil and gas leases"); § 1701(b)(5) (utilizing "the capabilities of the States and Indian tribes in developing and maintaining" a royalty management system); § 1716(2) (requiring independent contractors to "maintain a bond commensurate" with the amount of their potential liability).

Statoil's interpretation of § 1719(d) would also lead to bizarre results. It would impose no obligation under § 1719(d) for a company to correct a false affidavit unless the lessee physically possesses it, and it would permit the sanction only of a lessee's inaccurate *internal* reports. Such an interpretation would therefore mean that the statute imposes the harshest penalties for inaccurate internal reports while requiring lighter sanctions for certain inaccurate reports that the government physically stores—and therefore is more likely to rely on. Not only would this be nonsensical, it would be inimical to the establishment of an "accounting and auditing system" with the "capability to accurately determine oil and gas royalties" owed by private lessees. § 1711(a).

Statoil also asserts that because § 1719(a) and § 1719(b) explicitly govern failures to correct false reports, § 1719(d) should be interpreted to punish only deceptive acts, not the knowing failure to correct false reports. As the district court noted, this interpretation would create an "extratextual, heightened mental state requirement" that is disconnected from the text's "knowing[] or willful[]" mental state requirement. *Statoil*, 352 F. Supp. 3d at 762. Both

§ 1719(a) and § 1719(b) specify lower penalties for conduct without a requisite mental state, whereas the text of § 1719(c) and § 1719(d) specifies higher penalties for violations that are "knowingly or willfully" performed.[8] The text also indicates that overlap among these subsections was contemplated. For example, § 1719(c) provides high-level penalties for the knowing or willful "failure" to pay a royalty or permit an inspection, even though those failures would be prohibited under § 1719(a) and § 1719(b) as well.

Last, Statoil contends that DOI's application of § 1719(d) violates principles of fair notice because it has not been applied in over three decades. Given the facts below, this question is not properly before this court. Statoil had actual notice that its reports were inaccurate, and this defense was waived below.[9] Moreover, § 1719(d) is "reasonably clear" that Statoil's conduct was prohibited even if it was not deliberately fraudulent, *United States v. Lanier*, 520 U.S. 259, 267 (1997). In addition, the government's interpretation is not "an about-face [that] flatly contradicts the agency's earlier, contemporaneous interpretation," *United States v. Moss*, 872 F.3d 304, 315 (5th Cir. 2017) (internal quotation marks omitted), because the government has not previously represented that § 1719(d) would not apply to conduct like Statoil's. Rather, the government notes § 1719(d) was applied for the first time as a result of the "unusually recalcitrant nature of Statoil's conduct."

---

[8] While we need not rely on legislative history, this penalty scheme aligns with Congress's "attempt[] to achieve . . . balance" between the "need to deter violations" and a desire to minimize liability for "relatively minor or inadvertent violations." S. Rep. No. 97-512, at 17.

[9] Statoil argues that the government's reading would automatically confer knowledge, and therefore liability, on lessees once the government sends the lessee a notice of violation. As the district court observed, the notice "only gives a reporter knowledge that the Government believes the reporter's information on file is inaccurate." *Statoil*, 352 F. Supp. 3d at 764 n.57. A reporter may nonetheless still believe, in good faith, that its reports are accurate or may have yet to form an opinion. *Id.* Here, Statoil acknowledged that its reports were inaccurate long before § 1719(d) was applied.

No. 18-20827

**IV.**

For the foregoing reasons, we AFFIRM the judgment of the district court.