# United States Court of Appeals
## For the First Circuit

No. 23-1761

JAROSLAV HORNOF, a resident and citizen of the Czech Republic;
DAMIR KORDIC, a resident and citizen of Croatia; LUKAS ZAK, a
resident and citizen of the Slovak Republic,

Plaintiffs, Appellants,

v.

UNITED STATES; UNITED STATES DEPARTMENT OF JUSTICE; UNITED
STATES COAST GUARD; UNITED STATES DEPARTMENT OF HOMELAND
SECURITY; SHANE N. WALLER, a former employee of the United
States Department of Justice; JOHN D. CASHMAN, an employee of
the United States Department of Justice; RICHARD UDEL, an
employee of the United States Department of Justice; MICHAEL A.
FAZIO, Commander, First Coast Guard District of the United
States Coast Guard; MICHAEL BAROODY, Captain and Commanding
Officer, United States Coast Guard, Sector Northern New England;
JON D. LAVALLEE, Lieutenant, First Coast Guard District Legal
Office; MARK ROOT, Special Agent, United States Coast Guard
Investigative Service; CHRISTY DOYLE, a citizen of Maine
employed by the United States Customs and Border Protection;
SHANNON TRUE, a citizen of Maine employed by the United States
Customs and Border Protection,

Defendants, Appellees,

KEITH FLEMING, Port Director, Custom and Border Protection,
South Portland, Maine,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Kayatta, Howard, and Gelpí,
<u>Circuit Judges</u>.

───────────────

<u>Edward S. MacColl</u>, with whom <u>Marshall J. Tinkle</u>, and <u>Thompson, Bull, Bass & MacColl, LLC, P.A.</u>, were on brief, for appellants.

<u>Anne Murphy</u>, Attorney, Appellate Staff, Civil Division, United States Department of Justice, with whom <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Darcie N. McElwee</u>, United States Attorney, and <u>Charles W. Scarborough</u>, Attorney, Appellate Staff, were on brief, for appellees.

───────────────

July 15, 2024

───────────────

**GELPÍ**, **Circuit Judge**. Jaroslav Hornof ("Hornof"), Damir Kordic ("Kordic"), and Lukas Zak ("Zak") (collectively, "Plaintiffs") were crewmembers aboard the MARGUERITA, a vessel that was allegedly unlawfully disposing of bilge water and improperly keeping records. The MARGUERITA was held in-port in Maine, and Plaintiffs were ordered to remain in the United States as potential material witnesses to the wrongdoing. Plaintiffs were later permitted to leave the United States, returned for trial, and were awarded for their contributions to conviction. As a result of their detention and parole order to remain in the United States, Plaintiffs filed suit under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and the Federal Tort Claims Act ("FTCA"), against the United States, the United States Department of Justice ("DOJ"), the United States Coast Guard ("Coast Guard"), the United States Department of Homeland Security ("DHS"), and nine Government Officials in their individual capacities (collectively, "Government" or "Defendants").[1] The district court dismissed the Bivens claim and

---

[1] Plaintiffs' Bivens claim was for alleged violations of their Fourth, Fifth, Sixth, and Thirteenth Amendment rights. The FTCA claims included false imprisonment, false arrest, abuse of process, and intentional infliction of emotional distress. In addition, but not at issue on appeal, Plaintiffs brought claims against the individual Defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and claims against the Defendants collectively under the Act to Prevent Pollution from Ships, Pub. L. 96-478, 94 Stat. 2297 (1980) (codified as amended at 33 U.S.C. §§ 1901-1915) ("APPS") for compensation for

entered summary judgment for Defendants on the FTCA claims. Plaintiffs timely appealed, arguing that the district court erred in the dismissal and entry of summary judgment. We disagree and affirm.

## I. Background

## A. Statutory Background

The United States is a party to the 1973 International Convention for the Prevention of Pollution from Ships and the Protocol of 1978, which combined are referred to as MARPOL, short for marine pollution. United States v. Vastardis, 19 F.4th 573, 577 (3d Cir. 2021); United States v. MST Mineralien Schiffarht Spedition Und Transport GmbH, No. 2:17-cr-117, 2018 WL 522764, at *2 (D. Me. Jan. 22, 2018); International Convention for the Prevention of Pollution from Ships, Nov. 2, 1973, 1340 U.N.T.S. 184; Protocol of 1978, Feb. 17, 1978, 1340 U.N.T.S. 61. The objective of MARPOL is to "achieve the complete elimination of international pollution of the marine environment by oil and other harmful substances." Protocol of 1978, supra, 1340 U.N.T.S. at 128. The United States enforces MARPOL through federal statute, APPS, criminalizing violations of MARPOL. MST, 2018 WL 522764, at *2; Vastardis, 19 F.4th at 577. Whistleblowers are incentivized

---

unreasonable detainment, declaratory and injunctive relief, and claims under the federal criminal statutes against peonage, involuntary servitude, and human trafficking.

to report APPS and MARPOL violations because 33 U.S.C. § 1908(a) specifically states that, "[i]n the discretion of the [c]ourt, an amount equal to not more than 1/2 of such fine may be paid to the person giving information leading to conviction." In addition, APPS authorizes the Coast Guard[2] to "prescribe any necessary or desired regulations to carry out the provisions of . . . MARPOL." 33 U.S.C. § 1903(c)(1); see also 33 C.F.R. § 151.01.

One federal regulation at issue is 33 C.F.R. § 151.25, the "Oil Record Book" regulation. The regulation states that a "ship of 400 gross tons and above . . . shall maintain an Oil Record Book" kept "readily available for inspection at all reasonable times." 33 C.F.R. § 151.25(a), (i). Entries must be made in the Oil Record Book whenever there is "[d]ischarge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces." 33 C.F.R. § 151.25(d)(4). The entries must be "fully recorded without delay" and "signed by the person or persons in charge of the operations" and "the master or other person having charge of the ship." 33 C.F.R. § 151.25(h). APPS only applies to foreign-flagged ships "in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States." 33 C.F.R. § 151.09(a)(5); see

---

[2] Section 1903(c)(1) gives "[t]he Secretary" the authority to carry out the provisions of MARPOL. 33 U.S.C. § 1903(c)(1). "The Secretary" is defined as "the Secretary of the department in which the Coast Guard is operating." 33 U.S.C. § 1901(a)(11).

also 33 U.S.C. § 1902(a)(2). Flag states, meaning the country or countries where the ships are registered, are responsible for enforcement of MARPOL violations that occur in international waters. United States v. Ionia Mgmt. S.A., 555 F.3d 303, 308 (2d Cir. 2009) (discussing law of the flag doctrine).

Furthermore, 8 C.F.R. § 252.1, titled "Examination of crewmen," requires detention of "[a]ll persons employed in any capacity on board any vessel or aircraft arriving in the United States . . . by the master or agent of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service." 8 C.F.R. § 252.1(a). Federal regulation 8 C.F.R. § 212.5, titled "Parole of aliens into the United States," outlines when and how noncitizens can be paroled. 8 C.F.R. § 212.5(a), (c)-(d).

## B. Facts

The following facts are undisputed unless noted otherwise. In 2017, Plaintiffs were working aboard the MARGUERITA, registered in the Republic of Liberia, the crew of which were not United States citizens nor residents.[3] The MARGUERITA was owned by Reederei MS "Marguerita" GmbH & Co., and operated by MST Mineralien Schiffahrt Spedition und Transport, GmbH (collectively

---

[3] Hornof is a citizen of the Czech Republic, Kordic is a citizen of Croatia, and Zak is a citizen of the Slovak Republic.

"MST").[4]  Hornof noticed that the MARGUERITA's pollution-control system had been altered, allowing unfiltered, dirty bilge water to flow directly into the ocean.  He realized that the Chief Engineer of the MARGUERITA was making false entries into the Oil Record Book.  Hornof documented his discovery through pictures, videos, and notes, confronting the Chief Engineer about the activity.  The Chief Engineer ignored Hornof's concerns, and when Hornof reported the issue to the MARGUERITA's Captain, the Captain told Hornof that the Chief Engineer reported that everything was being conducted and documented correctly.  Hornof then reported his concerns to an MST superintendent.

MST was already on probation in the United States for committing environmental crimes and was required to report any wrongdoing on its vessels.  MST informed United States officials of the alleged wrongdoing and reported that the MARGUERITA would be audited by a third party when it arrived in Brazil.  The audit confirmed Hornof's account.  MST informed the Coast Guard of the allegations and audit as a "Voluntary Disclosure," providing that the situation was "fully, accurately and contemporaneously memorialize[d]" in the vessel's Oil Record Book.

---

[4] "MST" refers to both the owner and operator of the MARGUERITA as the two entities' relationship to one another is irrelevant to the appeal.

The MARGUERITA arrived in Portland, Maine on July 7, 2017, where United States Customs and Border Protection ("CBP") officials boarded the vessel and granted Plaintiffs temporary landing privileges.[5]  The Coast Guard also boarded the MARGUERITA to conduct a Port State Control Inspection and found that one or more Oil Record Book entries were inaccurate or missing, thereby concluding that a detailed and thorough "MARPOL examination" was needed.  Later that day, additional Coast Guard members boarded the vessel and began the MARPOL examination which included speaking with the crewmembers about the bilge water concerns.[6]  While speaking with Coast Guard officials, "Hornof recounted his discovery of the bilge water discharge system, played the video he had taken of the pumps and hoses used in the discharge operation, and showed officials the equipment used to bypass the [pollution-control system]."

---

[5]  Hornof and Kordic were awarded D-1 conditional landing permits issued under 8 U.S.C. § 1282(a)(1), permitting them to go onshore temporarily while waiting for their vessel to depart, and Zak was awarded a D-2 conditional landing permit also issued under 8 U.S.C. § 1282(a)(2), permitting him to land temporarily in the United States and depart on his flight back home as his contract with MST had expired.

[6] The parties dispute the number of Coast Guard officials who boarded the MARGUERITA and the manner in which the officials interacted with the crewmembers.  However, the number of officials is irrelevant to the issues on appeal.  As to the interactions, while Plaintiffs claim that they were "interrogated," the Government claims that the officials conducted "interviews." Viewing the record in the light most favorable to Plaintiffs and drawing reasonable inferences in their favor, we accept their account of the interactions.

After the MARPOL examination, the Coast Guard requested that the MARGUERITA and its crew be placed on customs hold pursuant to 33 U.S.C. § 1908(e), as the Coast Guard had determined it had probable cause to believe that unlawful violations occurred, identifying material witnesses. On July 8, 2017, the vessel's departure clearance was denied and Plaintiffs' conditional landing permits were revoked and replaced with new Form I-95s denying their permission to land temporarily. CBP gave the MARGUERITA's shipping agent a Form I-259 ("Notice to Detain, Remove, or Present Alien"), requiring detention of the crew aboard the vessel, and the witnesses identified were designated as "mala fide."

Plaintiffs remained on board the MARGUERITA from July 8 to July 16, 2017. On July 12, Government officials and MST received the auditor's report and referred the matter to the DOJ for criminal prosecution. The Coast Guard's investigation concluded on July 15. On July 14, the Coast Guard and MST negotiated an Agreement on Security ("Agreement") pursuant to 33 U.S.C. § 1908(e) requiring MST to request the crewmembers who were identified as potential witnesses to surrender their passports, disembark, and remain in Maine during the investigation. MST was required to notify the Government if a passport was requested and wait up to 72 hours before complying with the request. Plaintiffs were not parties, and did not consent, to the Agreement. On the same day as the Agreement, Zak filed a petition for habeas corpus

to request that he be allowed to return home, which was followed by the Government's obtaining of a material witness arrest warrant three days later.

On July 16, Plaintiffs were granted temporary parole while their Significant Public Benefit Parole applications, submitted by the Coast Guard Investigative Service ("CGIS"), were pending. Once paroled by CBP, Plaintiffs' passports changed hands at CBP's request as a condition of Plaintiffs' release from the vessel from MST to the Coast Guard. The material witness arrest warrants included a requirement that Plaintiffs surrender their passports to the Coast Guard. Per the Agreement, Plaintiffs were lodged in a hotel in Maine, checked on once a day, and given a meal allowance, healthcare coverage, and wages. On July 30, Hornof's mother-in-law died, resulting in his counsel requesting permission on August 3 to allow Hornof to leave the United States by October 1. Hornof requested his passport, and the Government obtained an arrest warrant for him as a material witness on August 9, followed by Kordic's arrest warrant as a material witness on August 21 after his passport request on August 9. On August 22, Hornof and Kordic testified before a grand jury, resulting in the indictment of MST.

That same day, Plaintiffs challenged the validity of the material witness arrest warrants, claiming that the affidavits prepared by CGIS Special Agent Mark Root ("Special Agent Root")

contained misleading and false information, requesting Plaintiffs be deposed pursuant to Federal Rule of Criminal Procedure 15(a)(2). Special Agent Root had drafted and signed the affidavits for each of Plaintiffs, with the affidavits including mostly identical information except for differences regarding the specific role of each Plaintiff and the information they provided in their interviews. A Magistrate Judge determined that Plaintiffs had been detained under the material witness statute, 18 U.S.C. § 3144, and ordered they be deposed within 30 days and permitted to leave the United States thereafter. Plaintiffs were deposed on September 11 and 12, 2017 and subpoenaed to testify at MST's trial. Plaintiffs' motion to quash the subpoenas was denied. On September 14, Plaintiffs left the United States.

MST was criminally prosecuted for APPS violations and obstruction of justice. MST, 2018 WL 522764, at *1. Plaintiffs returned to the United States to testify at trial on May 7, 2018, and learned that MST was negotiating a plea agreement that did not include criminal liability under APPS, therefore leaving Plaintiffs with no hope of a whistleblower award. They moved to be heard in connection with the plea and to be rewarded as whistleblowers under APPS. The district court suggested that Hornof's actions should be rewarded as it acknowledged the risks he took. The plea agreement was revised and MST pled guilty to two counts, one regarding the failure to maintain the Oil Record

Book and one for obstruction of justice. The district court allocated half of the $500,000 monetary penalty for the APPS violation to Plaintiffs: $225,000 to Hornof, and $12,500 each to Kordic and Zak.

## C. Procedural History

In May 2019, Plaintiffs filed a civil action against the United States, the DOJ, the DHS, the Coast Guard, and nine individual employees who worked on the investigation.[7] Plaintiffs asserted claims against Defendants under the FTCA, APPS, and federal statutes against peonage, involuntary servitude, and human trafficking, seeking declaratory and injunctive relief, damages, and attorneys' fees. Plaintiffs asserted claims against the individual Defendants under Bivens and RICO.[8] Defendants filed two motions to dismiss: one on behalf of all Defendants arguing sovereign immunity, a lack of subject matter jurisdiction, and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), and one on behalf of the individual

---

[7] The individual defendants are three federal prosecutors, four Coast Guard officials, and two CBP officials.

[8] We discuss only the claims at issue on appeal: the FTCA claims for false arrest, false imprisonment, abuse of process, and intentional infliction of emotional distress and the Bivens claim.

- 12 -

Defendants under Rule 12(b)(6).  The district court granted the joint motion in part and the individual Defendants' motion in full.

Plaintiffs' FTCA claims for false imprisonment and false arrest, abuse of process, and intentional infliction of emotional distress were permitted to proceed, and the other claims in the amended complaint, along with the <u>Bivens</u> claim, were dismissed. The district court concluded that the <u>Bivens</u> remedy was unavailable because Plaintiffs' claims presented a "new context" under <u>Bivens</u> and that special factors counseled hesitation, including both challenging the implementation of a general policy and the presence of alternative remedies.

Defendants filed a motion for summary judgment and the district court entered judgment in their favor.[9]  As for the false arrest and imprisonment claims, the district court determined that Defendants had the authority to revoke the land permits and remand Plaintiffs to the vessel, and that Plaintiffs did not show that, in any event, the revocations caused them to be unlawfully confined.  Next, the district court concluded that the record could not support a finding that the revocation of the permits resulted

_____

[9] Before entering judgment, the district court ordered the parties to address two new issues: (1) whether 8 U.S.C. § 1252(a)(2)(B)(ii) barred judicial review of the decisions to revoke the D-1 and D-2 shore passes and remand Plaintiffs to the vessel, and (2) whether the revocation of the shore passes was an immigration enforcement-related action that has no analogous private person liability, therefore not actionable under the FTCA.

- 13 -

in unlawful confinement or that Plaintiffs' detention on the vessel was unauthorized. The district court determined that Plaintiffs had not provided a trial-worthy issue of whether the nine-day confinement on the vessel differed from their initial detention at the port and that a reasonable jury could not find that their detention was unauthorized. The duration of the detention was also found not to be unreasonable under the Fourth Amendment. The district court then concluded that Defendants were authorized to apply for Significant Public Benefit Parole for Plaintiffs, that the delay in issuing the warrants for potential material witnesses was de minimis as to Hornof, and that Kordic remained lawfully detained in the United States. The district court determined that once Plaintiffs requested their passports, the public benefit of Plaintiffs' parole had not yet been fulfilled and thus the denial to return their passports was authorized. The district court concluded that the record satisfied both the materiality and impracticability prong of the material witness warrants, therefore Plaintiffs were not falsely imprisoned after receiving the warrants.

As for the abuse of process claim, the district court concluded that the record could not support that the affidavits were submitted for an improper or collateral purpose, therefore the claim failed. As for the intentional infliction of emotional distress claim, the district court concluded that because

Plaintiffs could not establish material elements for their false arrest, false imprisonment, or abuse of process claims, their intentional infliction of emotional distress claim could not survive. Even if one of the other claims was viable, the record did not support that Defendants' behavior was "extreme and outrageous" exceeding "all possible bounds of decency." This timely appeal followed.

## II. Discussion

Plaintiffs' main argument is that they did not commit a United States crime, so they could not have been detained. Plaintiffs further claim that the district court erred in (1) ruling that Plaintiffs could not establish false arrest or false imprisonment under the FTCA and had not raised material facts to reasonably find that the government officials had exceeded their lawful authority, (2) determining that Plaintiffs could not establish abuse of process under the FTCA, (3) determining that Plaintiffs could not establish intentional infliction of emotional distress under the FTCA, and (4) dismissing the Bivens claim. We address these arguments seriatim.

### A. Summary Judgment for FTCA Claims

### 1. Standard of Review

We review a challenge to an order of summary judgment de novo. See López-Hernández v. Terumo P.R. LLC, 64 F.4th 22, 28 (1st Cir. 2023) (citing Murray v. Kindred Nursing Ctrs. W. LLC,

789 F.3d 20, 25 (1st Cir. 2015)). We view the record "in the light most favorable to the nonmovant and draw[] all reasonable inferences in that party's favor." Id. (citing Murray, 789 F.3d at 25). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute "is one on which the evidence would enable a reasonable jury to find the fact in favor of either party." Perez v. Lorraine Enters., Inc., 769 F.3d 23, 29 (1st Cir. 2014) (citing Vasapolli v. Rostoff, 39 F.3d 27, 32 (1st Cir. 1994)). "A 'material' fact is one that is relevant in the sense that it has the capacity to change the outcome of the jury's determination." Id. (citing Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). However, "we need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" Dixon-Tribou v. McDonough, 86 F.4th 453, 458 (1st Cir. 2023) (quoting Lahens v. AT&T Mobility P.R., Inc., 28 F.4th 325, 333 (1st Cir. 2022)).

## 2. FTCA

"The FTCA provides 'a limited congressional waiver of the sovereign immunity of the United States for tortious acts and omissions committed by federal employees acting within the scope of their employment.'" Soto-Cintrón ex rel A.S.M. v. United States, 901 F.3d 29, 33 (1st Cir. 2018) (quoting Díaz-Nieves v.

- 16 -

United States, 858 F.3d 678, 683 (1st Cir. 2017)).  The FTCA "expressly allows actions for claims of 'assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.'"[10]  Solis-Alarcón v. United States, 662 F.3d 577, 583 (1st Cir. 2011) (quoting 28 U.S.C. § 2680(h)).  "We look to local law to determine" government liability.  Soto-Cintrón, 901 F.3d at 33.  And here, that means that "we must extract the substantive rules of decision from [Maine] law."  Id. (quoting Calderón-Ortega v. United States, 753 F.3d 250, 252 (1st Cir. 2014)).

### a. False Arrest and False Imprisonment

Under Maine law, both false arrest and false imprisonment require that the plaintiff was confined.  See Steeves v. City of Rockland, 600 F. Supp. 2d 143, 184 (D. Me. 2009) (citation omitted); Smith v. Heritage Salmon, Inc., 180 F. Supp. 2d 208, 220 (D. Me. 2002).  To prevail, "the authority upon which [the plaintiff] is confined must be unlawful."  Santoni v. Potter,

---

[10] The discretionary function exception under the FTCA, a common exception to the waiver of sovereign immunity, "bars liability for claims 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" Evans v. United States, 876 F.3d 375, 380 (1st Cir. 2017) (quoting 28 U.S.C. § 2680(a)).  We need not consider this exception as Plaintiffs' claims are rooted in the violation of the Fourth Amendment, and "[i]t is elementary that the discretionary function exception does not . . . shield conduct that transgresses the Constitution."  Limone v. United States, 579 F.3d 79, 101 (1st Cir. 2009).  In addition, the claims fail as a matter of law on other grounds.

369 F.3d 594, 603 (1st Cir. 2004) (quoting Nadeau v. State, 395 A.2d 107, 116 (Me. 1978)).

As an initial matter, Plaintiffs argue that Defendants were not authorized to hold Plaintiffs as witnesses to a crime because no crime was committed.

Plaintiffs first attempt to discredit the Government's reliance on APPS and its accompanying regulations to detain and prosecute them by arguing that its interpretation is invalid when viewed in the context of the wider legislative scheme. Plaintiffs contend that although the Coast Guard's regulation makes reference to a ships' duty to "maintain" an Oil Record Book, MARPOL makes clear that "maintain" just means "keep on board." Further, Plaintiffs argue that the duty to inspect a vessel's Oil Record Book "affords no right to take any further action against the foreign vessel other than to report it to the flag state." Therefore, Plaintiffs posit that it is untenable to think that the United States cannot prosecute ship owners for failing to properly record their high-seas violations, but can prosecute the ship for arriving to the United States with an Oil Record Book that has failed to properly record the event.

Next, Plaintiffs insist that the Oil Record Book regulations are derived from the Oil Pollution Act of 1961,[11] which

_____

[11] Pub. L. No. 87-167, 75 Stat. 402.

- 18 -

required every United States-flagged ship to carry an Oil Record Book. Plaintiffs note that there were no penalties for foreign-flagged ships that did not carry Oil Record Books, therefore the current Coast Guard regulation should not apply to Oil Record Book entries made on foreign vessels with respect to high-seas violations. Further, they argue that an improper entry made on the high seas cannot be a continuing offense when entering the United States.[12]

Plaintiffs next attempt to make a textual argument stating that 33 C.F.R. § 151.25(a) and (j)[13] do not require a vessel

_____

[12] For support, Plaintiffs refer to a 2000 General Accounting Office ("GAO") report. This argument rests on speculation that the Coast Guard was misleading the GAO as to why the Coast Guard essentially ceased to refer foreign-flagged ships cases to their flag state when the Oil Record Book regulations were put into place and were prosecuting more cases in the United States. Plaintiffs claim that the Coast Guard and the DOJ "disregarded" recommendations to increase referrals to foreign flag states, and the Coast Guard instead changed the meaning of the Oil Record Book regulation. This argument is speculative and unpersuasive. Because, as we later explain, APPS unambiguously allows the Coast Guard to prosecute foreign vessels for maintaining inaccurate Oil Record Books, we see no relevance in the Coast Guard's historical enforcement of APPS.

[13] Section 151.25(a) states:
> [E]ach oil tanker of 150 gross tons and above, ship of 400 gross tons and above other than an oil tanker, and manned fixed or floating drilling rig or other platform shall maintain an Oil Record Book Part I (Machinery Space Operations). An oil tanker of 150 gross tons and above or a non oil tanker that carries 200 cubic meters or more of oil in bulk, shall also maintain an Oil Record Book Part II (Cargo/Ballast Operations).

- 19 -

to maintain an Oil Record Book that is "complete" and "accurate," and the terms are not subsumed within "maintain." Further, Plaintiffs argue that "maintain" and "keep" are used interchangeably in the Coast Guard regulation, with § 151.25(a) specifying the types of vessels that are required to maintain an Oil Record Book, and § 151.25(j) stating that the master or other person in charge is required to "keep" an Oil Record Book and "shall be responsible for the maintenance of such record," thereby the terms must have the same meaning. 33 C.F.R. § 151.25(a), (j). Plaintiffs contend that the person in charge of record-keeping is responsible for preservation, not accuracy.

Other circuits faced with this same question, whether the improper maintenance of an Oil Record Book in violation of 33 C.F.R. § 151.25 is a valid crime, have answered the question in the affirmative. See Vastardis, 19 F.4th at 583; Ionia, 555 F.3d at 308; United States v. Jho, 534 F.3d 398, 404 (5th Cir. 2008). We find no reason to come to a different conclusion.

The Fifth Circuit in Jho stated that "ignoring the duty to maintain [an Oil Record Book] puts the [Coast Guard] regulation at odds with MARPOL and Congress' clear intent under the APPS to prevent pollution at sea according to MARPOL." Jho, 534 F.3d at

---

33 C.F.R. § 151.25(a). Section 151.25(j) states "[t]he master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record." 33 C.F.R. § 151.25(j).

403. If no maintenance were required of Oil Record Books within United States waters, foreign-flagged vessels could falsify all their information before entering United States waters or ports. Id. This would significantly hinder the Coast Guard's ability to inspect ships for wrongdoing and permit polluters to harm the environment. Id. Accordingly, we agree with the Fifth Circuit and cannot conclude that Congress intended to "frustrate the government's ability to enforce MARPOL[]" when imposing limitations on APPS's application to foreign-flagged vessels. Id. The requirement to "maintain" the Oil Record Book "impos[es] a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States." Id.

The Second Circuit in Ionia delved deeper into the plain text of the Coast Guard regulation. Ionia, 555 F.3d at 309. "Maintain" means to "keep in an existing state (as of repair, efficiency, or validity)." Maintain, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/maintain [https://perma.cc/MPM6-KSKN] (last visited May 24, 2024). "In the context of a regulation imposing record-keeping requirements, the duty to 'maintain' plainly means a duty to maintain a reasonably complete and accurate record." Ionia, 555 F.3d at 309. It is thus unreasonable to conclude that the Coast Guard regulation

- 21 -

requires only the preservation of the Oil Record Book in its existing state without accuracy.  Id.

Finally, the Third Circuit in Vastardis relied on its decision in United States v. Abrogar, 459 F.3d 430 (3d Cir. 2006), to further support that 33 C.F.R. § 151.25 is a valid regulation based on its plain reading.  Vastardis, 19 F.4th at 584 (citing Abrogar, 459 F.3rd at 435).  In Abrogar, later reiterated by Vastardis, the court determined that the failure to maintain an Oil Record Book offense was satisfied even though the conduct which had been recorded occurred on the high seas.  Vastardis, 19 F.4th at 584.  This is because the crime committed pertained to the Oil Record Book not being properly maintained while in a United States port, not the conduct on the high seas.  Id.

Further, the Third Circuit emphasized that the Coast Guard regulation does not "flout the division of authority set forth in MARPOL and [APPS]."  Id.  Flag states are permitted to prosecute misconduct no matter where it occurs, whereas port states have concurrent jurisdiction to prosecute conduct in their own ports.  Id.; International Convention for the Prevention of Pollution from Ships, supra, Art. 4(1)-(2), 1340 U.N.T.S. at 185; id. Art. 6(2), 1340 U.N.T.S. at 187.  "Port states also play a key role in detecting (if not prosecuting) such misconduct."  Vastardis, 19 F.4th at 584.  In order for a port state to refer violations on the high seas to flag states, a vessel must maintain

- 22 -

accurate Oil Record Books to be reviewed by port officials like the Coast Guard. Id. Vastardis noted that without this prohibition, vessels could have two Oil Record Books: one accurate for flag-state inspection and one false for port-state inspection, diminishing the importance of the record book to begin with. Id. at 585.

We follow these analyses and conclude that 33 C.F.R. § 151.25 is indeed a valid regulation under the jurisdiction of the United States based on its text, and does not circumvent MARPOL or APPS, but instead ensures both are upheld, furthering the objectives prescribed. To hold otherwise would flout international law and defeat the purpose of MARPOL and APPS -- to permit member states to report violations and foster a spirit of international accountability. Our analysis and conclusion dispose of many of Plaintiffs' arguments, and the rest remain unpersuasive.[14] Therefore, the requirement for ships to "maintain" an Oil Record Book under 33 C.F.R. § 151.25 is valid, and based on the facts, was properly pursued by the United States Government.

---

[14] Plaintiffs also rely on the major-questions doctrine in support of their narrower interpretation of APPS, reasoning that Congress would not have delegated to the Coast Guard the ability to alter "both Congressionally-established national policy and international policy." But the major-questions doctrine merely dictates the level of deference a court should extend to an agency's interpretation of a statute. And here, we need not extend any deference to the Government's preferred reading of APPS; the statute speaks clearly.

- 23 -

Having established that 33 C.F.R. § 151.25 is valid, we conclude that Plaintiffs' arguments for false arrest and false imprisonment are unpersuasive. Plaintiffs argue that the primary issue is whether the officials had the legal authority to confine the crewmembers and whether Plaintiffs' detentions were reasonable under the Fourth Amendment. Plaintiffs refer to four distinct periods in question: (1) false arrest from the unlawful revocation of the permits, (2) false imprisonment on the vessel resulting from the revocation of the permits and implementation of the Agreement from July 8 to July 16, 2017, (3) false imprisonment on United States soil from July 16 until August 21 when all of Plaintiffs' arrest warrants were issued, and (4) false imprisonment within the United States based on the material witness warrants supported by "false and misleading affidavits."

### i. Revocation of Permits and Detention from July 8 to July 16

To begin, we can easily dismiss Plaintiffs' argument that CBP falsely arrested and imprisoned them by revoking their landing permits because nothing in the record supports a conclusion that the revocation resulted in confinement, as per Maine law. True, when the CBP revoked the landing permits, Plaintiffs were prohibited from disembarking. But that alone is not a confinement. See Restatement (Second) of Torts § 36, cmt. b, illus. 8 (Am. Law. Inst. 1965) ("A wrongfully prevents B from entering the United States. A has not confined B, although B, in a sense, may be said

- 24 -

to be confined within the rest of the habitable world."). The crew was confined to the ship because the Coast Guard ordered the ship to stay in the port; had that order not been in place, the ship could have departed. Thus, the act of revoking the permits cannot serve as a basis for the FTCA claim.

Nor can the ensuing nine-day shipboard detention. Outside of one conclusory sentence in their opening brief, Plaintiffs fail to argue on appeal that the Coast Guard lacked statutory authorization to hold the ship in Portland. We accordingly consider that argument waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Further, we disagree with Plaintiffs' arguments that the confinement was unconstitutional, lacking due process under the Fifth Amendment, or interfering with Plaintiffs' Fourth Amendment privacy and security rights. The Supreme Court has held that a noncitizen "seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude [noncitizens] is a sovereign prerogative." Landon v. Plasencia, 459 U.S. 21, 32 (1982). Specifically related to the Fourth Amendment claims, as stated by the district court, "it was not arbitrary or unreasonable for immigration officials, once informed that the Coast Guard had probable cause to believe that violations of federal law had occurred and that the crewmembers would be critical witnesses in

the investigation, to revoke the conditional landing permits," and detain Plaintiffs on the vessel. We must balance the alleged intrusion on Plaintiffs' Fourth Amendment protections against the Government's interests and the importance of said interests to justify said intrusion. Scott v. Harris, 550 U.S. 372, 383 (2007). Even assuming there was such an intrusion, the Government's interest in conducting a criminal investigation and preserving material noncitizen witnesses outweighs it. Therefore, there is no genuine issue of material fact as to unlawful confinement on the vessel.

### ii. Detention from July 16 to August 21

Plaintiffs argue that because they did not consent to the Agreement, they therefore did not consent to their parole and its conditions, resulting in them being "forced ashore." However, there is nothing in the record to support the contention that the Plaintiffs were "forced ashore." For example, the Agreement expressly limited MST's obligations to "request[ing]" that Plaintiffs and other potential witnesses surrender their passports to MST while the ship remained in port, and that those crewmembers disembark and remain in Maine during the investigation. So, even if Plaintiffs were misinformed about the Agreement, the fault, if any, would seemingly lie with MST rather than the Government. Meanwhile, Plaintiffs point to no reliable evidence suggesting government wrongdoing. Alternatively, the record supports the

finding that there was an ongoing criminal investigation with probable cause of a federal violation and indications that Plaintiffs were material witnesses. In addition, the record supports a finding that reasonable conditions of parole were imposed to achieve the objective of the investigation. Therefore, the record cannot support a finding that the parole was unjustified. No reasonable jury could find that the Agreement "forced" the Plaintiffs ashore, therefore the jury could not find, based on the evidence presented, that the Government lacked justification to submit the Plaintiffs to Significant Public Benefit Parole. Because the Plaintiffs do not otherwise challenge the lawfulness of the parole, they cannot show that the parole resulted in false imprisonment or arrest.

### iii. Continued Detention after Arrest Warrants

Plaintiffs claim that the Government was not authorized to arrest Plaintiffs because the warrants were secured by misleading affidavits. Under 18 U.S.C. § 3144, prosecutors may ask a judge to "order the arrest of" material witnesses and "treat [them] in accordance with" the detention provisions of the criminal code. Live testimony of material witnesses is preferred to Rule 15 depositions. United States v. Mann, 590 F.2d 361, 366 (1st Cir. 1978); Fed. R. Crim. P. 15. To secure material witnesses, warrants must be issued. There are two parts to determine whether a warrant was properly issued. "If it appears from an affidavit

filed by a party that the testimony of a person is material in a criminal proceeding," the materiality prong, "and if it is shown that it may become impracticable to secure the presence of the person by subpoena," the impracticability prong, the person may be arrested. 18 U.S.C. § 3144. Plaintiffs claim that because there was no violation of APPS, the materiality prong of the analysis was not satisfied. We have, however, already determined that there was a valid violation of APPS under investigation at the time of the arrest warrants, therefore the materiality prong was satisfied.

We now turn to the impracticability analysis. Plaintiffs next claim that Special Agent Root noted in his affidavits that Plaintiffs lived overseas, but "deliberately omitted numerous material facts casting doubt on the need for [Plaintiffs'] detention." The allegedly omitted facts include that Plaintiffs were cooperative and agreed to testify, Hornof had appeared to testify prior to his arrest warrant, Kordic had agreed to testify one day after Special Agent Root's request for his arrest, APPS' witnesses have a strong incentive to testify due to the potential award, the United States had treaties requiring cooperation with subpoenas with some of Plaintiffs' home countries, the Government had held Plaintiffs in its custody, Plaintiffs' passports were being held, Plaintiffs were being

monitored by the Government, and that Plaintiffs had petitioned the court for the return of their passports.

"A Fourth Amendment violation may be established if [it can be shown] that officers acted in reckless disregard, with a 'high degree of awareness [that] [the statements'] probable falsity'" were used to support an arrest warrant. Forest v. Pawtucket Police Dep't, 377 F.3d 52, 58 (1st Cir. 2004) (third alteration in original) (citation omitted). In addition, "the intentional or reckless omission of material exculpatory facts from information presented to a magistrate may also amount to a Fourth Amendment violation." Burke v. Town of Walpole, 405 F.3d 66, 81 (1st Cir. 2005); United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003). "Reckless disregard for the truth in the submission of a warrant application may be established where an officer 'in fact entertained serious doubts as to the truth of the allegations' or where 'circumstances evinc[ed] obvious reasons to doubt the veracity of the allegations' in the application." Burke, 405 F.3d at 81 (alteration in original) (quoting United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002)). "[R]ecklessness may be inferred where the omitted information was critical to the probable cause determination." Id. at 81-82 (quoting Golino v. New Haven, 950 F.2d 864, 871 (2d Cir. 1991)). The omissions or misrepresentations must be "material to the probable cause determination." Id. at 82. To determine if the omissions or

misrepresentations were material, "we excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." Id. (quoting Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000)).

There exists no genuine issue of material fact to even suggest that Special Agent Root intentionally misrepresented or omitted facts while drafting the affidavits. The same goes for any alleged recklessness by Special Agent Root. The allegedly omitted facts would not have altered or undermined the Magistrate Judge's finding of probable cause. See Burke, 405 F.3d at 82. Each Plaintiff is from a foreign country, outside the reach of United States subpoena power. Even if some of Plaintiffs' home countries have treaties with the United States requiring them to cooperate in criminal investigations, their foreign citizenship, coupled with their requests to obtain their passports and return to their countries, would have further supported the Magistrate Judge's probable cause determination if included in the warrant applications. Plaintiffs did not provide any information or point to provisions in the treaties that would require them to return to testify if subpoenaed. Plaintiffs' willingness to testify would not have undermined the Magistrate Judge's probable cause determination because as foreign citizens, they could later decide to refuse to return to the United States to testify.

Plaintiffs' argument that their parole conditions and passport confiscations undermine the Magistrate Judge's decision also falls flat. The Magistrate Judge was keenly aware that Plaintiffs were not in possession of their passports when making the probable cause determination because the applications stated that there were no prohibitions to them leaving "once [each crewmember] regains possession of his passport." This bolsters, not hinders, the probable cause determination.

Plaintiffs' assurances to testify and their alleged incentive to testify through the APPS award similarly leaves the probable cause determination unaltered if such were added to the warrant applications. In nearly identical circumstances, it has been insufficient to rely on witnesses' promises to testify because once they are beyond the jurisdiction of the United States, the impracticability of securing their testimony is too great. See In re M/V Joanna, No. 21-mc-592, 2021 WL 2514687, at *11 (E.D. La. June 18, 2021). Even with the alleged incentive to return for the APPS reward, it is not enough. It is not clear that Special Agent Root had knowledge of this incentive or that the facts suggest that Plaintiffs would have been incentivized to return. Therefore, under the circumstances presented, the combination of information provided in the arrest warrant applications -- Plaintiffs' foreign citizenship, their documented requests to obtain their passports, their requests to terminate parole, their lack of connection to

the United States, and their expressed desires to leave -- was sufficient for an impracticability finding. Plaintiffs' alleged additional facts are insufficient to change the analysis. Accordingly, the false arrest and false imprisonment claims fail as well.

### b. Abuse of Process

The FTCA permits claims for abuse of process arising from "acts or omissions of" federal "investigative or law enforcement officers." 28 U.S.C. § 2680(h). "Elements necessary to sustain such an action include (1) a use of the process in a manner not proper in the regular conduct of the proceedings and (2) the existence of an ulterior motive." Nadeau, 395 A.2d at 117. "Abuse of process may be demonstrated 'if a Plaintiff can show an improper use of process for an immediate purpose other than that for which it was designed and intended.'" OfficeMax Inc. v. Sousa, 773 F. Supp. 2d 190, 240 (D. Me. 2011) (quoting Grace v. Yarnall, 346 F. Supp. 2d 222, 224 (D. Me. 2004)).

Plaintiffs claim that Special Agent Root used fraudulent affidavits to secure arrest warrants against them. In addition, Plaintiffs claim that the paperwork for revocation of Plaintiffs' landing permits "using the fiction that they were not bona fide crewmen," and using the parole process "solely for the purpose of detaining on U.S. soil crewmembers who had no desire to be there," could be found by a jury as abuses of process. However, the only

- 32 -

conclusion to be drawn from the record is that Special Agent Root and the other investigative officials had secured the arrest warrants, revoked the visas, and detained Plaintiffs in order to advance the Government's criminal investigation and ensure that Plaintiffs remained in the United States to participate in the proceedings against MST. Even in the light most favorable to Plaintiffs, there is no factual support in the record that Special Agent Root or any other official took action for a different, improper reason -- nor did Plaintiffs identify any support here or below. Therefore, the district court was correct in concluding that Plaintiffs could not establish their abuse of process claim.

### c. Intentional Infliction of Emotional Distress

We also agree with the district court that the Government was entitled to summary judgment on the intentional infliction of emotional distress claim. Under Maine law,

> [t]he four elements of a claim for intentional infliction of emotional distress are that "(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the

> plaintiff was so severe that no reasonable person could be expected to endure it."

Argereow v. Wesberg, 195 A.3d 1210, 1219 (Me. 2018) (quoting Curtis v. Porter, 784 A.2d 18, 22-23 (Me. 2001)). "The determination of whether the facts alleged are sufficient to establish that the defendant's conduct is 'so extreme and outrageous to permit recovery' is a question of law for the court to decide." Id. (quoting Champagne v. Mid-Maine Med. Ctr., 711 A.2d 842, 847 (Me. 1998)). To prove extreme and outrageous conduct, a plaintiff must allege that the defendant did more than merely break the law. See Bratton v. McDonough, 91 A.3d 1050, 1058 (Me. 2014).

Plaintiffs do allege extreme and outrageous conduct; they accuse the Government of knowingly acting with no legal authority, thereby of "unconscionably treat[ing] Plaintiffs as human collateral or chattel." But Plaintiffs supply no evidence supporting that allegation. As we have explained, the record does not indicate that the government officials acted unlawfully and thus certainly cannot support a conclusion that they knew they were acting unlawfully. Cf. Limone, 579 F.3d at 97-99 (holding that FBI agents acted extremely and outrageously by not disclosing exculpatory evidence to state authorities, continuing to advocate that the authorities arrest the plaintiff, and then "stonewalling"

the plaintiff's post-conviction attacks by refusing to investigate the officer that lied about the plaintiff's guilt).

### B. Dismissal of <u>Bivens</u> Claim

### 1. Standard of Review

"[W]e review the grant of a motion to dismiss de novo, accepting well-pled facts as true and drawing all inferences in favor of the non-moving party." <u>Rivera-Rosario</u> v. <u>LSREF2 Island Holdings, Ltd.</u>, 79 F.4th 1, 4 (1st Cir. 2023) (alteration in original) (quoting <u>Triangle Cayman Asset Co.</u> v. <u>LG & AC, Corp.</u>, 52 F.4th 24, 32 (1st Cir. 2022)). "The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." <u>Ocasio-Hernández</u> v. <u>Fortuño-Burset</u>, 640 F.3d 1, 7 (1st Cir. 2011) (citing Fed. R. Civ. Pro. 12(b)(6)). We therefore must determine whether Plaintiffs' complaint provided a viable claim under <u>Bivens</u>.

### 2. <u>Bivens</u> Claim

"A <u>Bivens</u> claim is an implied cause of action for civil damages against federal officials . . . equivalent to the statutory cause of action against state officials" for Constitutional violations. <u>Pagán-González</u> v. <u>Moreno</u>, 919 F.3d 582, 586 n.1 (1st Cir. 2019). <u>Bivens</u> claims have been permitted by the Supreme Court in three situations: (1) in <u>Bivens</u>, 403 U.S.

388, itself, where a man asserted a Fourth Amendment claim against police officers for handcuffing him in his home without a warrant, (2) in Davis v. Passman, 442 U.S. 228 (1979), where a congressional administrative assistant brought a claim under the Fifth Amendment after she was fired based on her sex, and (3) in Carlson v. Green, 446 U.S. 14 (1980), where an incarcerated person's estate brought a claim against a prison official under the Eighth Amendment for failure to provide medical care.  See Ziglar v. Abbasi, 582 U.S. 120, 130-31 (2017).

"[E]xpanding the Bivens remedy is now a 'disfavored' judicial activity."  Id. at 135 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Because it is generally the role of Congress, not the courts, to supply a damages remedy, we must proceed with caution in recognizing implied causes of action in "new context[s]."  Id. at 135-36 (quoting Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 68 (2001)).  The context is new "[i]f the case is different in a meaningful way from previous Bivens cases."  Id. at 139.  A case may meaningfully differ if "it implicates a different constitutional right; if judicial precedents provide a less meaningful guide for official conduct; . . . if there are potential special factors that were not considered in previous Bivens cases," or if there is a "new category of defendants."  Id. at 135, 148.  In addition, "the rank of the officers involved," and "the risk of disruptive intrusion by the Judiciary into the

- 36 -

functioning of other branches" are also taken into consideration in determining whether the case presents a new context. Id. at 140. If the case is not meaningfully different, Bivens relief is available. Quinones-Pimentel v. Cannon, 85 F.4th 63, 70 (1st Cir. 2023).

If the case raises a "new context" then "a Bivens remedy will not be available if there are special factors counselling hesitation in the absence of affirmative action by Congress." Ziglar, 582 U.S. at 136 (internal quotation marks and citation omitted). When conducting a special-factors analysis, it is important to note that "a Bivens action is not 'a proper vehicle for altering an entity's policy.'" Id. at 140 (quoting Malesko, 534 U.S. at 74). A Bivens claim is also not a proper avenue for challenging the "formulation and implementation of a general policy." Id. at 141. "The necessary inference [when considering whether special factors counsel hesitation] is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Id. at 136. Courts should analyze "whether there [are] alternative remedies available." Id. at 149. A special factor counselling hesitation "must cause a court to hesitate before answering that question in the affirmative." Id. at 136. If special factors are

present, "relief is unavailable." Quinones-Pimentel, 85 F.4th at 70.

### a. New Context

Plaintiffs argue that this case does not meaningfully differ from Bivens, and therefore does not present a new context, because it is sufficiently comparable to Bivens itself. Specifically, Plaintiffs contend that, like in Bivens, they too were arrested by federal law enforcement officials and detained for months without probable cause. Plaintiffs further argue that the fact that they were non-resident seamen, and the fact that the arrest took place on a vessel rather than an apartment, do not meaningfully differentiate this case from Bivens because non-residents have the right to bring Bivens claims and the vessel was effectively Plaintiffs' home for an extended time. In addition, Plaintiffs argue that it is not a meaningful distinction that the enforcement officers involved here were members of the Coast Guard and CBP because they were not enforcing immigration or national security laws. Lastly, Plaintiffs assert that recognition of their Bivens claim would not intrude upon another branch of government because the claim turns on the knowledge and actions of federal law enforcement officers.

After careful review of the record, we conclude that the district court properly found that Plaintiffs' Bivens claim presented a new context. To begin, the plaintiff in Bivens was a

United States citizen who challenged a warrantless arrest in his home pursuant to a narcotics investigation. Here, Plaintiffs are non-resident seamen challenging their detention on board a foreign vessel and the events surrounding the detention, providing a meaningful difference. In addition, Bivens was solely predicated on a Fourth Amendment claim whereas here, Plaintiffs raise Fourth, Fifth, Sixth, and Thirteenth Amendment claims. Further, members of the Coast Guard are generally not subject to Bivens claims. See Ziglar, 582 U.S. at 137 (citing Chappell v. Wallace, 462 U.S. 296, 302 (1983)) (discussing the viability of Bivens claims involving the armed forces). The remaining individual defendants are three prosecutors, which have not been recognized as proper defendants under Bivens, see Quinones-Pimentel, 85 F.4th at 72 (collecting cases that conclude prosecutors are a new category of defendants), and two CBP Officials, which could implicate immigration and national security concerns, see Egbert v. Boule, 596 U.S. 482, 496 (2022) (determining that a court is not competent "to authorize a damages action . . . against Border Patrol agents generally").[15] "[E]ven a modest extension is still an extension." Ziglar, 582 U.S. at 147. These characteristics present a

---

[15] Plaintiffs argue that this case does not involve immigration policies or national security. However, as discussed below, Plaintiffs do challenge the Agreement put into effect, thereby challenging the Coast Guard's policies, implicating national security concerns, and challenge CBP officials' actions, implicating immigration concerns.

meaningful difference, therefore resulting in a new context under Bivens.

### b. Special Factors

Plaintiffs argue that they did not have sufficient alternative remedies through habeas corpus relief or their motions for modification of their conditions of release. They claim that Defendants "used unlawful processes and false and misleading statements" to prevent Plaintiffs from obtaining an effective remedy. As to habeas corpus, Plaintiffs claim that Defendants "avoided communications from the court to forestall a hearing or conference." They further allege they were deprived of their assistance of counsel when they were paroled into the United States. Plaintiffs, however, concede that the court did allow them to give deposition testimony and leave the country after they had sought modifications to their conditions of release. Lastly, Plaintiffs argue that there are no other "special factors" that counsel hesitation. They claim that "[t]here is no reason to believe that Congress opposes allowing the victims of such abuse to directly sue [federal law enforcement officers] when the false arrest violated the Constitution."

We conclude, however, that there were sufficient alternative remedies available, and there are other special factors counseling hesitation. To begin, "the existence of an alternative remedy . . . gives us sufficient reason to take a

beat." Quinones-Pimentel, 85 F.4th at 74. Here, Plaintiffs had moved the district court for habeas corpus relief, for return of their passports, and for release after their depositions were taken. In addition, Plaintiffs received monetary rewards from the Government for providing evidence in the criminal case. CBP's grievance process has been recognized as an alternative remedy in damages claims against CBP officials. Egbert, 596 U.S. at 498 ("[W]e have no warrant to doubt that the consideration of Boule's grievance against Agent Egbert secured adequate deterrence and afforded Boule an alternative remedy."). "[R]emedies such as . . . writs of habeas corpus . . . are sufficient to foreclose Bivens relief and qualify as alternative remedies." Quinones-Pimentel, 85 F.4th at 74.

Moreover, Plaintiffs' challenge of the Coast Guard's policy of executing security agreements that require seamen to remain in the United States presents a special factor. A Bivens challenge is not the proper avenue for altering an entity's policies. See Ziglar, 582 U.S. at 140. Plaintiffs also note that the Liberian government "protested [the United States] government's actions in detaining the ship." When governments disagree, however, "[i]t is not our task to arbitrate between them." Hernandez v. Mesa, 589 U.S. 93, 105-06 (2020). It is therefore Congress's role "to 'weigh the costs and benefits of allowing a damages action to proceed'" in this kind of situation,

not ours.  Quinones-Pimentel, 85 F.4th at 70 (quoting Egbert, 596 U.S. at 492).  Due to these factors and the alternative remedies available to Plaintiffs, the district court did not err in dismissing the Bivens claim.

### III. Conclusion

For the reasons stated, the district court's orders granting summary judgment and dismissal are

**Affirmed**.